**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**PINE BLUFF DIVISION**

**RICHARD DEVAL INGRAM**                                    **PETITIONER**

**VS.**                          **CASE NO. 5:15CV00272 KGB/PSH**

**WENDY KELLEY, Director of the**
**Arkansas Department of Correction**                      **RESPONDENT**

**PROPOSED FINDINGS AND RECOMMENDATION**

**INSTRUCTIONS**

The following recommended disposition has been sent to United States District Court Judge
Kristine G. Baker.  You may file written objections to all or part of this Recommendation.  If you
do so, those objections must: (1) specifically explain the factual and/or legal basis for your
objection; and (2) be received by the Clerk of this Court within fourteen (14) days of this
Recommendation.  By not objecting, you may waive the right to appeal questions of fact.

**DISPOSITION**

Richard Deval Ingram ("Ingram") seeks a writ of habeas corpus pursuant to 28 U.S.C. §2254.
He is currently in the custody of the Arkansas Department of Correction (ADC) following a 2012
jury trial in the Circuit Court of Jackson County on the charge of capital murder in connection with
the death of his infant son.  He was sentenced to life imprisonment without parole.  On direct appeal,
Ingram's sole claim was error when the trial court removed a juror without justification.  The direct
appeal was unsuccessful.  *Ingram v. State*, 2013 Ark. 446.  Ingram subsequently sought Rule 37
relief, filing a January 2014 petition with the trial court alleging two instances of ineffective
assistance of counsel: (1) his attorney should have requested a mental evaluation; and (2) his
attorney failed to call an expert witness to support an affirmative defense that he was reprimanding
his son, as influenced by "cultural factors," rather than intending to kill his son.  The trial court

denied relief, a ruling which was affirmed by the Arkansas Supreme Court. *Ingram v. State*, 2014 Ark. 350.

Ingram, in his federal habeas corpus petition, claims:

(1) violation of *Batson* when the prosecution exercised peremptory challenges to strike all black jurors;

(2) prosecution failed to present evidence Ingram acted "knowingly;"

(3) violation of his Fifth Amendment rights when the detective fraudulently tricked Ingram "into answering for a capital crime without an indictment" (petition, page 8);

(4) failure of Ingram's attorney to object to two jurors showing emotion during the trial;

(5) ineffective assistance of counsel for pursuing a defense of mental defect;

(6) error by the trial judge in improperly removing a black female juror;

(7) trial court error in failing to give proper jury instruction on the mental state required to show capital murder; and

(8) racial bias by the trial judge in failing to remove a white female juror from the panel.

**Procedural Default:**   Respondent Wendy Kelley ("Kelley") contends claims 1, 2, 3, 4, and 8 are not properly before this Court due to Ingram's failure to adequately raise the claims in state court, as required by *Wainwright v. Sykes*, 433 U.S. 72 (1977), and its progeny.  By Order of the Court dated December 9, 2015, Ingram was notified of his opportunity to explain why these grounds should not be dismissed on a procedural basis.  He responded to this Order.

We first consider the issue of procedural default, and will then turn to the merits of the issues.  Our review of the record includes a careful review of the entire trial transcript and the appellate decisions on direct and collateral review in state court.  It is apparent that grounds 1, 2, 3, 4, and 8 were not raised in state court.  Even so, the Court has the discretion to proceed to the merits of these claims despite the apparent procedural default.  In considering this issue, we are guided by the following language of the Eighth Circuit Court of Appeals:

In cases such as this, it might well be easier and more efficient to reach the

merits than to go through the studied process required by the procedural default doctrine.  Recent commentary points up the problems with the cause and prejudice standard:

> [T]he decision tree for habeas review of defaulted claims is intricate and costly. . . .  In essence, *Sykes* and *Strickland* require habeas lawyers and federal judges and magistrates to work through the equivalent of a law school exam every time a defendant tries to escape procedural default.

*McKinnon v. Lockhart*, 921 F.2d 830, 833 n.7 (8th Cir. 1990) (quoting Jeffries & Stuntz, *Ineffective Assistance and Procedural Default in Federal Habeas Corpus*, 57 U.Chi.L.Rev. 679, 690 (1990)).  Here, we find the more efficient and thorough approach to be a consideration of the merits of the eight claims advanced by Ingram.

**Claim 1: violation of *Batson* when the prosecution exercised peremptory challenges to strike all black jurors:** The trial transcript contains the voir dire of potential jurors.  A review of that record does not substantiate Ingram's assertion that the prosecution exercised peremptory challenges to strike all black jurors.  The record shows the prosecution excused Paul Person due to his statement that the state would have to remove "all doubt" from his mind in order to gain a conviction.  (Tr. 711).  Person's race was not identified, and Ingram's counsel concurred that Person should be excused.  The prosecution also excused Kisha Jones, race unidentified, due to a history of not cooperating with the prosecution in domestic violence cases.  Again, Ingram's counsel conceded the prosecution's reason for excusing Jones was warranted.  (Tr. 712).  James Scoggin, Adam Stevens, C.P. McDonald, Cathy Beesley, and Burt Willard, none of whom were identified by their race, were excused by the prosecution without explanation and without objection.  (Tr. 712, 781).  No *Batson* motion was made during the selection of the jury.

Although the record does not specifically reflect the racial makeup of the jury, a development during the trial shows Ingram is factually in error in claiming all blacks were excluded from the jury.  The sheriff reported to the trial judge that a juror had talked with members of Ingram's family, in violation of the trial judge's instructions.  (Tr. 927).  The trial judge halted the trial and explored the situation.  The juror, identified as a black woman, was questioned by the trial judge.  The juror stated she talked to a co-worker she knew.  This co-worker was seated with defense witnesses, although

she was not a witness.  After the *in camera* hearing, there was testimony that the juror left chambers and appeared to be very angry.  (Tr. 927-942).  After first ruling the juror could remain on the panel, the trial judge changed his mind and removed her.  The trial judge specifically noted that the next alternate was a black male, so that the racial makeup of the jury did not change with the removal of the black female.  During this discussion the trial judge and the lawyers were aware of the *Batson* issue[1], though no objection was made.  (Tr. 936, 943).

In summary, the record demonstrates no *Batson* objection was made at any point.  The record fails to substantiate Ingram's claim that the prosecution used peremptory challenges to strike all black jurors, and all black women.  (Petition, page 5).  Even liberally construing Ingram's allegations, there is simply no factual basis for a *Batson* claim.  As a result, the first claim for relief is without merit.

**Claim 2: prosecution failed to present evidence Ingram acted "knowingly:"**  Ingram argues a failure on the part of the prosecution to show he acted knowingly, an essential element of the crime of capital murder.  As with the first claim for relief, the trial transcript is at odds with Ingram's contentions.  The prosecution introduced into evidence during its case in chief several statements Ingram made to investigators and physicians when Ingram explained what happened to his son.  First, Ingram reported that the child had been hit by a bicycle.  He then reported that the child had also hit his head the previous night.  Finally, Ingram admitted that he whipped the child with a belt and shook the child because he was crying.  These statements were offered in contrast to the medical testimony offered.

Dr. Tomlinson, the emergency room doctor who examined Ingram's child on August 13, 2010, testified the child was lifeless, with no heartbeat, no breathing, fixed and dilated pupils, and with multiple injuries not consistent with a history of being hit by bicycles.  (Tr. 1036-1037).  Based upon this "very grim outlook," Dr. Tomlinson quickly called Arkansas Children's Hospital and

---

[1]The trial judge said, "Well, *Batson*, but, I mean, the next juror is African-American, too." (Tr. 936).

arranged for helicopter transport.  (Tr. 1040).  Dr. Moss examined Ingram's son upon arrival at Arkansas Children's Hospital, finding him deeply comatose with no brain function and no gag reflex.  She also found multiple areas of injury, including bruises on his forehead, over his cheeks, across his right chest and right abdomen, whip marks[2] on his back where the skin had been broken, a "very deep, long laceration" around his anus, and blood coming out of his ear canals and mouth, along with a retinal hemorrhage.  (Tr. 1065-1066).   The large bruise to the child's forehead could not have been sustained by shaking, according to Dr. Moss.  Instead, she testified such a bruise would result from "some type of impact."  (Tr. 1086).  Dr. Moss opined the child died from a massive head injury secondary to impact.

Dr. Erickson, the Deputy Chief Medical Examiner at the Arkansas State Crime Lab, performed an autopsy on Ingram's son, who was 35 inches tall and weighed 30 pounds at his death. His testimony was consistent with that of Dr. Moss regarding a multitude of bruises, whip marks, and impact injuries.  In addition, his autopsy revealed the child was subjected to a "severe amount of shearing force" from behind, resulting in the transection of his spinal cord and spinal column ("it's been completely cut in half").  (Tr. 1146, 1149).  Dr. Erickson concluded the child died from multiple traumatic injuries inflicted "at the hands of another."  (Tr. 1163).

The jury, hearing Ingram's statements to law enforcement and medical personnel, as well as from the medical examiner and medical care providers, was tasked with the duty of determining Ingram's mental state.  The jury was instructed that they were the "sole judges of the weight of the evidence and the credibility of the witnesses."  (Tr. 1373).  They were also instructed that "a fact in dispute may be proved by circumstantial evidence as well as direct evidence."  (Tr. 1374).  We find overwhelming evidence supports the jury's conclusion that Ingram acted knowingly.

Ingram's attorney argued he didn't act "knowingly" during voir dire, drawing an objection from the prosecution:

---

[2]Dr. Moss stated there were so much crisscrossing whip marks that "you couldn't count them . . . There were more than thirty that I could count."  (Tr. 1072).

[Ingram's attorney – William James]:  If you get to the end of this trial and you find that this young man right here caused the death of his child knowingly, when he was practically certain that when he did what he did the child would die . . .

[prosecutor – Henry Boyce]: Your Honor, again, we're going through an opening statement and he's arguing and he's not trying to find out what these jurors know or don't know or whether they are qualified.  He's making speeches.

By the Court:  Mr. James, ask questions.

Mr. James: Yes, sir.

By the Court: Not opening statements.  Ask questions.

Mr. James: Yes, sir.

(Tr. 663).

Ingram's attorney returned to the theme of "knowingly" during opening statements:

But the law says you have - to be found guilty of capital murder you have to knowingly do it.  You have to be practically certain at the time you are doing it . . . it is what he is thinking at the time.

And they have to prove to you - the evidence has to prove, in order for you to find him guilty, that he knew at the time he was doing it that it was going to cause his death.

And I think the evidence is going to show here that he just didn't know.

(Tr. 804-805).

At closing argument, Ingram's attorney again argued Ingram did not possess the requisitie mental state:

All right.  He didn't know that what he was going to do was going to cause the child's death.

I told you that at the beginning and I think that has been shown in this trial.

6

. .

> A person acts knowingly with respect to his conduct of the attendant circumstances when he is aware that his conduct is of that nature and the circumstances exist.
>
> A person acts knowingly with respect to the results of his conduct when he is aware or practically certain that his conduct will cause a result.
>
> And what is the result?
>
> The result is the death of Damarrius.
>
> So in order to find him guilty of capital murder, you have to find out first of all that he's aware that what he is doing could cause his death.  And he is practically certain it's going to cause his death.
>
> Now, there is just no evidence of that.  There is no evidence . . .
>
> But if you are honest, I truly believe that you know that he did not know - he did not knowingly cause the death of his child.

(Tr. 1397, 1418-1419, 1435).

The transcript also reflects the jury was instructed that the crime of capital murder required proof that Ingram knowingly caused the death of his child.  The jury was instructed on the definition of knowingly.  (Tr. 1378).  Having been properly instructed, the jury's guilty verdict reflects their conclusion that Ingram acted knowingly.  The circumstances surrounding the child's death, the manner of death, and Ingram's admitted beating of the child were all evidence upon which the jury could have, and did, find that he acted knowingly.  The evidence of Ingram's mental state was not lacking, and the second ground for relief is without merit.

**Claim 3:  violation of his Fifth Amendment rights when the detective fraudulently tricked Ingram "into answering for a capital crime without an indictment:"**  In the course of the investigation, Ingram gave two custodial statements to Newport Police Department Detective Patrick Weatherford.  For his third claim for relief, Ingram alleges he was tricked into giving these

statements in violation of the Fifth Amendment.

Prior to trial, Ingram moved to suppress these statements and a hearing was conducted. Weatherford testified to meeting Ingram at the hospital waiting room on August 13, 2010, after Ingram's son had been taken by ambulance to the hospital. Weatherford indicated he told Ingram he was not under arrest and was free to leave at that time. Ingram told Weatherford that his 23 month old son was struck by two small children on bicycles the previous day. While still in the waiting room, a physician approached Ingram and asked about his son. Weatherford listened to this conversation, and Ingram "eventually" told the doctor that he had beaten his son with a belt and shaken the boy on August 12-13. (Tr. 515). After hearing this, Weatherford arrested Ingram and had him transported to the Newport Police Station.

Weatherford then interviewed Ingram twice. The first interview, conducted on August 13, 2010, was audio taped, and Ingram was advised of and waived his *Miranda* rights prior to speaking. The second interview, conducted the following day, was both audio and video taped, and Ingram again was advised of and waived his *Miranda* rights prior to speaking. Prior to the first audio interview, Weatherford told Ingram that he had experienced a situation similar to Ingram, as Weatherford had been a young single father with a mother that was not interested in the child. At the suppression hearing, Weatherford testified this story was fictitious, offered to develop rapport with Ingram. Weatherford described this as using "some deceit and trickery" to encourage Ingram to talk with him. (Tr. 533). Weatherford's trial testimony mirrored that given at the hearing on the motion to suppress the statements. He again conceded he told Ingram a fictional story to earn his trust, describing this as an interview technique taught by law enforcement. On cross examination, Ingram's attorney focused on Weatherford's tactics:

Q. [Ingram's attorney] All right. Now you - you talked about your training and your experience gave you certain investigative techniques. Correct? And the main technique I think we heard about was lying. Right?

A. [Weatherford] Correct.

Q. And do you go to a liar's school for that?  Or is that just something that you just
learned that hey - if I lie to these people, they'll talk to me?

A. I don't know if there is any such thing as a liar's school.  However in interview
and interrogation school that is a common tactic that law enforcement uses that's
been - that's received its blessing from the Court so . . .

Q. It's legal?

A. Yes, sir.  It is. . . .

Q. Okay.  Are you - okay- some people - there's a lot of things that are legal that
some people find morally reprehensible.  Do you agree with that?

A. I do.

Q. Abortion.  Legal.  A lot of people don't like it.  Right?  So lying to a person -
lying to get a conviction - lying to get a statement - all legal.  I want to know your
personal opinion on it.

A. My personal opinion on lying?

Q. On lying.  Yes.

A. I don't know what the dictionary says but I would view that a lie is something
that you do for personal gain.  I - yes, I practice deceit and trickery, which I believe
is the word the Supreme Court uses in *Frazier versus Cupp* in 1969 and . . .

(Tr. 971-973).

Ingram appears to argue that his conviction is constitutionally infirm because Weatherford
employed the strategy of using a fictional story to develop rapport.  This conclusion is legally
incorrect.  Ingram, fully apprised of his rights, waived them and spoke voluntarily with Weatherford
on both occasions.  Weatherford correctly cited *Frazier v. Cupp*, 394 U.S. 731 (1969) for the
proposition that misrepresentations on the part of the government do not make a statement *per se*
involuntary.  *See also Flittie v. Solem*, 775 F.2d 933 (8th Cir. 1985).  Ingram fails to establish any
error, much less an error of constitutional magnitude, in the admission of his statements.  The third

9

claim for relief is without merit.

**Claim 4: failure of Ingram's attorney to object to two jurors showing emotion during the trial:** In his petition, Ingram writes, "During trial, I believe during my testimony, two jurors (a white man and a white woman) showed emotion by crying. My defense counsel did not object to this." Petition, page 9.

In order to prove ineffective assistance of counsel, petitioner must prove that (l) his attorney's actions were unreasonable when viewed in the totality of the circumstances; and (2) he was prejudiced because there is a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 688 (1983); *Ryder v. Morris*, 752 F.2d 327, 33l (8th Cir. l985). Even liberally construing Ingram's petition, he fails to establish either of the two prongs of the *Strickland* test. First, assuming the facts are as portrayed by Ingram, he does not show his attorney acted unreasonably. It is unclear what type of objection Ingram would have had his attorney make. In any event, any objection would have brought attention to the emotional jurors, a result which would not have favored Ingram. Second, even presuming Ingram's attorney should have objected, it is pure conjecture to believe the trial would have hinged on this moment. To the contrary, Ingram does not allege and cannot show the result of the trial would have changed. There is no merit to Ingram's fourth claim for relief.

**Claim 5: ineffective assistance of counsel for pursuing a defense of mental defect:** Ingram contends his attorney's presentation of a defense of mental defect constituted ineffective assistance of counsel. Again, we consider this claim using the *Strickland v. Washington* test.

According to Ingram, it was error for his attorney to abandon the strategy that he did not knowingly kill his son in favor of the mental defect strategy. The trial transcript, however, does not support Ingram's version of events and strategy. Instead, the transcript shows his attorney pursued two defense strategies: (1) Ingram suffered from a mental disease or defect; and (2) Ingram did not act knowingly. We have previously detailed the efforts of Ingram's counsel in arguing he did not act knowingly.

10

The defense of mental disease or defect was reflected in the witnesses called by the defense, and in the manner in which they were questioned. Ingram's mother, Lamecca Ransom, testified to Ingram's problems with school, failing to pass any grade after the ninth. She also stated he was unable to obtain his GED, unable to care for another person, and immature for his age. Finally, Ingram's mother testified that at the time of the child's death, plans were in the works for her to come to Newport and take care of the child. (Tr. 1184-1199). Ingram's own testimony included his problems in school and his inability to obtain his GED. (Tr. 1221-1222). Dr. William Cochran, a psychologist, testified for the defense, stating Ingram had educational problems and borderline intellectual functioning. Dr. Cochran stated Ingram's IQ was at the 5th percentile. (Tr. 1297-1350).

The defense of mental disease or defect was also reflected in the jury instructions sought and received by Ingram's counsel. The jury was instructed about Ingram's affirmative defense of mental disease or defect. (Tr. 1375-1378).

As we understand Ingram's claim, he faults counsel for choosing the mental disease or defect defense to the exclusion of the "desired 'accidental defense' strategy." Petition, page 12. The record shows, however, Ingram's counsel pursued both defenses, both in the calling of witnesses and in closing arguments. Therefore, the factual basis for this claim is lacking. Applying the *Strickland* formula in this instance, we find that Ingram does not show error in his attorney's choosing this course of action. The two lines of defense were not mutually exclusive, and the jury was presented with two paths to find Ingram innocent rather than one. Even if we were to presume error on the part of Ingram's attorney, he fails to satisfy the second *Strickland* prong as he does not demonstrate the trial's result would have been different if his attorney had omitted the defense of mental disease or defect. Our review of the transcript shows the evidence against Ingram was more than ample to support the conviction, regardless of whether the defense was limited only to "accidental defense." There is no merit to this claim.

Kelley construes this claim as a challenge to Ingram's attorney and his failure to offer an affirmative defense that could have shown Ingram's conduct in beating his son was influenced by

cultural factors and therefore was not done with intent to kill.  Although we do not construe the claim in this manner, Kelley is correct that this "cultural defense" claim was raised in Ingram's Rule 37 state court proceeding.  Kelley is also correct that when the state court has ruled on the merits of a petitioner's claims, a writ of habeas corpus may not be granted unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court."  28 U.S.C. § 2254(d)(1), (2).  Here, the state trial court and the Supreme Court of Arkansas rejected this claim[3]. Ingram offers no legal or factual reason to overcome the decisions rendered in state court. Therefore, even if Ingram's fifth claim is construed as attorney error in neglecting to assert a "cultural defense," the claim is without merit.

**Claim 6: error by the trial judge in improperly removing a black female juror:** On direct appeal, Ingram claimed the trial court committed reversible error by removing a juror without justification[4].  For his sixth claim, Ingram renews this allegation.  Kelley alleges the claim is only an allegation of a state law violation and, as such, should be dismissed.  However, we liberally construe the claim as one alleging Ingram's due process rights were violated by the trial judge's decision.

> In order to establish a denial of due process, the petitioner must prove that the asserted error was so gross, *Taylor v. Minnesota*, 466 F.2d 1119, 1121 (8th Cir. 1972), *cert. denied*, 410 U.S. 956 (1973), conspicuously prejudicial, *United States ex rel. Cannon v. Maroney*, 373 F.2d 908, 910 (3rd Cir. 1967), or otherwise of such magnitude that it fatally infected the trial and failed to afford the petitioner the fundamental fairness which is the essence of due process. *Lisenba v. California*, 314 U.S. 219 (1941).  In making this determination, the courts must review the totality of

---

[3]The Supreme Court of Arkansas dismissed this claim, noting Ingram "did not provide any information that would have established the existence of a 'cultural defense' in this case. Likewise, he failed to provide the names of witnesses or the substance of their testimony." *Ingram v. State*, 2014 Ark. 350.

[4]We have previously addressed these facts in the context of Ingram's first claim of a *Batson* violation.

the facts in the case pending before them and analyze the fairness of the particular trial under consideration.

*Maggitt v. Wyrick*, 533 F.2d 383 (8th Cir. l976).  See also *Kennedy v. Kemma*, 666 F.3d 472, 481 (8th Cir. 2012).

In this instance, the alleged error was considered on Ingram's direct appeal, with the following result:

> The relevant facts are these. Before jury selection, both the State and Ingram were asked to name their witnesses. The names were read to the venire. Before opening statements began, the circuit court gave the following instructions to the jury: [D]uring any recess or adjournment you must not talk to any one of the attorneys, parties, or witnesses about anything. You should not even pass the time of day with them in the courthouse or anywhere else. I say this not because I think you would discuss the case with them but simply because it is not proper for you to be seen talking with one side or another. In other words it is important that you be and appear to be impartial at all times during the trial of this cause.... I again remind you  not to discuss this case or talk at all with any attorneys, parties, or witnesses in this case.

> On the second day of trial, the bailiff informed the court that he had twice witnessed a juror speaking with a group of individuals that he believed to be witnesses or family members of Ingram. The circuit court summoned the individuals to chambers for questioning. Three of them had been identified as potential witnesses and one of the three, Ysla Rucker, was also part of Ingram's family. Rucker told the court that the juror had made remarks about coffee, but no further conversation other than she "might have spoke at recess when she walked past us ... just spoke to say hello to us." The other two witnesses confirmed Rucker's account.

> The court also questioned the juror, who denied speaking to any of the witnesses. She told the court that she was speaking to a co-worker that had been seated on the bench with those witnesses. At that time, the circuit court opined that it would leave the juror on the jury, stating, "[This is] a capital murder case. I will err [on the side of] caution. I don't think she has done enough to come off the jury. Maybe. I don't think."

> After a lunch break, the court returned to chambers. At that point, another individual was put under oath and testified that when Rucker and the other witnesses were leaving chambers, they were laughing. Additionally, that individual testified that the juror looked "really mad" when she left after having been questioned. It was then that the circuit court reconsidered leaving the juror in place.

> The circuit court announced that it would disregard the subjective testimony about  the juror looking mad, but that it was concerned about the variations in the story it had received from the witnesses and the juror and also about the testimony regarding the witnesses laughing when leaving chambers after having been

questioned. The juror was then removed and replaced by an alternate. It is from that decision to remove the juror that Ingram now appeals.

Ingram argues that the circuit court's removal of the juror was unjustifiable and without cause. Further, he asserts that this court should find that the removal was a "structural error" for which the impact cannot be evaluated and requires automatic reversal. The State avers that Ingram failed to argue and make the required showing of prejudice and that Ingram's argument rests on an unsound premise because a party is not entitled to a particular juror, only a fair panel. We find no error and affirm.

This court reviews a circuit court's decision to remove a juror and seat an alternate for an abuse of discretion. *See Smith v. State,* 343 Ark. 552, 39 S.W.3d 739 (2001) (citing *Lee v. State,* 340 Ark. 504, 11 S.W.3d 553 (2000)). We have also held that the appellant must demonstrate prejudice in such cases. *See id.* Whether prejudice occurred is also a matter for the sound discretion of the circuit court. *See Smith, supra* (citing *Dillard v. State,* 313 Ark. 439, 855 S.W.2d 909 (1993).

Ingram does not assert that any prejudice occurred from the circuit court's decision to seat the alternate juror. This court has been resolute in stating that it will not make a party's argument for them or raise an issue other than subject-matter jurisdiction sua sponte. *See Sullivan v. State,* 2012 Ark. 178. Instead, Ingram argues that the error alleged in the instant case is structural and, therefore, there should not be a prejudice analysis. However, that is not an argument that was made below. It is well settled that we do not consider issues that are raised for the first time on appeal. *See Adams v. State,* 2013 Ark. 174, —— S.W.3d ——. Furthermore, the only case Ingram now cites to support his argument, *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986), is easily distinguishable from the instant case as the *Vasquez* case dealt with racial discrimination. This court has specifically declined to apply a presumption of prejudice, as Ingram suggests we should do pursuant to *Vasquez,* to a case that does not focus on the use of a suspect classification, such as race, in the selection of jurors. *See Kelly v. State,* 350 Ark. 238, 85 S.W.3d 893 (2002).

This court cannot possibly hold on the record and argument before it that the circuit court abused its discretion in removing the juror and seating an alternate; therefore, we affirm. In the instant case, Ingram received a sentence of life in prison. Pursuant to Arkansas Supreme Court Rule 4–3(i) (2013), the record has been reviewed for all objections, motions, and requests that were decided adversely to Ingram, and no prejudicial error has been found.

*Ingram v. State*, 2013 Ark. 446.

In considering whether Ingram's due process rights were violated by the trial court's ruling, we are mindful that Ingram himself does not allege prejudice from the removal of the juror. In his petition, Ingram claims she was "improperly removed strategically." Petition, page 13. In our view, this is not an allegation of an error which fatally infected the trial. Our review

14

of the trial transcript shows the trial judge carefully considered the ramifications of this decision, including the race of the alternate juror to be seated. We conclude there was no error by the trial judge. State law grants him wide latitude in such rulings, and he did not abuse this discretion. It follows that there was no error of constitutional dimension. Ingram's due process rights were not infringed by this decision.

**Claim 7: trial court error in failing to give proper jury instruction on the mental state required to show capital murder:** Ingram claims the prosecution failed to prove he acted knowingly and, after this failure, the trial court should have instructed the jury with an "affirmative converse instruction" or "affirmative instruction." Petition, page 15. There are several reasons why this claim is without merit.

First, the factual premise of the claim – that the prosecution failed to prove he acted knowingly – is incorrect. As previously discussed, the jury was instructed on the definition of knowingly, and ample evidence supported their finding that Ingram acted in this manner.

Also, Kelley correctly argues that this claim does not even allege a violation of federal law, a prerequisite to federal habeas corpus relief. *See* 28 U.S.C. § 2254(a). Claims of state law error do not amount to viable claims for habeas corpus relief.

Finally, it is unclear what type of instructions Ingram is describing. What is clear from the transcript is that no objection was made to the jury instructions. (Tr. 1371-1381). As a result, no additional instructions were proffered. It is speculative at this point to claim an error in failing to instruct the jury with an "affirmative converse instruction" or "affirmative instruction." Conclusory claims such as these do not provide a basis for habeas corpus relief. Ingram's seventh claim for relief is without merit.

**Claim 8: racial bias by the trial judge in failing to remove a white female juror from the panel:** Ingram claims that a white female juror talked with Ingram's sister during a trial recess and "participated in taking a picture of my sister and I with my sister's camera, but this specific juror was not excluded as the black woman was." Petition, page 16. Ingram does

not indicate at what point in the trial this occurred, nor is any transcript citation provided.  There is no indication in the record that this alleged violation was raised at the time it occurred.  There is no indication that the trial judge was aware of the alleged incident, nor was the trial judge asked to remove the juror.

Federal habeas corpus relief is available for persons in custody in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).  Typically, in order to show such a violation a petitioner must point to a *constitutional* error in the state court proceedings.  *See, e.g., Estelle v. McGuire*, 502 U.S. 62 (1991) (federal habeas court is not to reexamine state court determinations on state law questions).  Here, Ingram invites the Court to intervene and essentially retry a portion of the case without any transcribed record.  We decline this invitation.  Ingram's eighth claim is not an appropriate claim for federal habeas relief.

**Summary:** Two major themes are woven throughout the eight claims raised by Ingram: one, the prosecution failed to prove he acted knowingly; and two, his attorneys should have done a better job.

The Court has previously found that overwhelming evidence supports the jury's conclusion that Ingram acted knowingly.

Ingram also complains his trial attorneys erred in numerous ways.  Since Ingram was charged with capital murder and was found to be indigent[5], he was eligible to receive an appointed attorney from the Arkansas Public Defender Commission.  Pursuant to this arrangement, William O. "Bill" James, an experienced criminal defense attorney, was appointed to represent Ingram.  (Tr. 124, 132).  Attorney Marjorie Rogers assisted James.  (Tr. 155-156).  Our careful review of the trial transcript shows Ingram received zealous representation under extremely difficult circumstances.  The outcome of the trial did not turn on any decision or

---

[5]At the outset of the case Ingram was represented by paid counsel, Ronald L. Davis, Jr.  Davis was relieved well in advance of the trial, and the attorneys from the Arkansas Public Defender Commission appointed in his place.  (Tr. 421).

decisions of Ingram's attorneys.  Rather, the child's violent death and the absence of any realistic alternate explanation of how his death occurred dictated the guilty verdict.  There is no merit to the various claims of ineffective assistance of counsel.

As noted early in our opinion, we have chosen to forego the procedural default analysis which was raised by Kelley.  In so doing, we addressed the merits of many claims which were clearly not raised in state court[6].  When we address such claims, Ingram actually benefits from an application of a lower standard of review.  Had the claims been raised in state court, Ingram would bear the burden of showing that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court."  28 U.S.C. § 2254(d)(1), (2).  Here, when we have foregone the procedural default analysis, Ingram need not address or overcome any state court decision and may proceed directly to the merits of these claims.  Even with this lower standard, Ingram falls far short of demonstrating any constitutional error occurred in his proceedings.

**Conclusion:** For the foregoing reasons, we recommend the petition for writ of habeas corpus be dismissed and the relief requested be denied because all claims are without merit.

Pursuant to 28 U.S.C. § 2253 and Rule 11 of the Rules Governing Section 2554 Cases in the United States District Court, the Court must determine whether to issue a certificate of appealability in the final order. In § 2254 cases, a certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(1)-(2). The Court finds no issue on which petitioner has made a substantial showing of a

---

[6]In our Order of December 9, 2015, we cited grounds 1-4 and 8 as possibly procedurally defaulted.  This was a conservative approach, as grounds 5 and 7 are arguably also subject to procedural default.

denial of a constitutional right. Thus, we recommend the certificate of appealability be denied.

IT IS SO ORDERED this 18th day of April, 2016.

_____
UNITED STATES MAGISTRATE JUDGE